**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:18-CR-93 RLW |
| | ) | |
| LEO ADAMS, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This closed criminal case is before the Court on Defendant Leo Adams' "Addendum to Original Compassionate Release 18 U.S.C. 3582(c)(1)(A)" (ECF No. 94), which the Court construes as a Motion for Reconsideration.  The United States opposes the Motion for Reconsideration on the merits.  (ECF No. 96.)  For the following reasons, Adams' Motion for Reconsideration and his motions for compassionate release will be granted to the extent set forth in this Order.

**Procedural Background**

Defendant Adams filed a pro se Motion for Reduction in Sentence Under 18 U.S.C. § 3582 as Amended by the First Step act of 2018 (ECF No. 73), asking the Court to enter an Order reducing his sentence or assign him to home confinement.  The Motion stated in part, "Adams has exhausted the notification requirement to the prison and the prison's Warden" (<u>id.</u> at 1).  There was no exhibit or other proof of exhaustion attached to the pro se motion, however.  The Federal Public Defender's Office ("FPD") filed a Supplemental Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (ECF No. 81).  The FPD subsequently filed supplemental "Exhibit A" (ECF No. 85), which is a copy of an email dated June 19, 2020, from

Adams to "Ms. Greer," requesting compassionate release.  The body of the email addressed to Ms. Greer appears to have been copied from a prior email from Adams requesting compassionate release dated April 29, 2020, but Exhibit A does not show the recipient of Adams' April 29, 2020 email.

The Government opposed Adams' motions for compassionate release on the basis that he failed to meet the First Step Act's administrative exhaustion requirement by presenting his request to the Federal Bureau of Prisons ("BOP") before filing his motion.  The Government argued Exhibit A, the June 19, 2020, email, was insufficient to establish that Adams' administrative request was appropriately submitted to the Forrest City Warden.  (ECF No. 91 at 6.)  The Government also opposed the motions on the merits.

The Court denied Adams' motions for compassionate release without prejudice stating, "Defendant has not exhausted all administrative remedies as required in 18 U.S.C. § 3582(c)(1)(A), nor have 30 days lapsed since receipt of the defendant's request by the warden of the defendant's facility.  The document Defendant submitted to establish that he exhausted administrative remedies (ECF No. 85) does not reflect that it was sent to the Warden."  Order of Oct. 16, 2020 (ECF No. 93 at 3.)

**Motion for Reconsideration**

Adams filed the pro se Addendum on November 10, 2020.  It was originally docketed as a Supplement, and the Court directed the Clerk to re-docket it as a Motion for Reconsideration on December 23, 2020 (ECF No. 94).  The Court ordered that any response to the Motion for Reconsideration be filed by January 6, 2021.  (ECF No. 95.)

Adams' Motion for Reconsideration explains, "At this facility, all warden requests are forwarded through the unit team then sent to the warden."  (ECF No. 94 at 2.)  Copies of two emails are attached to the Motion as exhibits.  Both bear a stamp and are initialed by someone–

presumably a BOP employee–with the job title "CSW," pursuant to 18 U.S.C. § 4004.  Exhibit 1 is a copy of an email from Adams to Forrest City Warden DeWayne Hendrix dated April 29, 2020, requesting compassionate release.  (ECF No. 94 at 4.)  Exhibit 2 is a copy of an email from Adams dated October 20, 2020, to "Mr. Sanderson" that states, "On April 20th, 2020, I sent an 'E' mail to unit staff and RIS coordinator to start the process of compassionate relief.  The court has asked for verification that I have exhausted all remedies to the BOP concerning compassionate release.  I am now sending a duplicate of the message from 6 months ago."  Below this, addressed to the Warden, is a request for compassionate release signed by Adams.  (Id. at 5.)

The United States responds that it is "not clear whether Defendant has properly presented his claim to the warden of his institution."  (ECF No. 96 at 2.)  Nonetheless, the United States says it has no reason to question Defendant's statement that he following the procedure required of him and, "If that is so, he has exhausted his administrative remedies."  (Id.)

Section 3582(c)(1)(A) imposes a statutory exhaustion requirement.  The Court finds that Adams submitted a request for reduction in sentence to the Warden of Forrest City Low on April 29, 2020.  There is no evidence in the record that the Warden ever responded.  The Court finds that Adams has now established he exhausted administrative remedies under the First Step Act.  As a result, the Court grants Adams' Motion for Reconsideration and turns to the merits of his motions for compassionate release.

**Background**

On February 7, 2018, a federal grand jury sitting in St. Louis, Missouri, returned a single-count indictment against Adams charging him with being a felon in possession of a firearm in violation of Title 18, United States Code, Section 922(g)(1).  (ECF No. 1.)  The indictment was based upon the following facts:

      a.  On December 7, 2017, officers with the St. Louis County Police Department responded to the Castle Point neighborhood in St. Louis County, Missouri, in an attempt to disrupt open-air narcotics sales, weapons violations and gang activity. While in the Castle Point neighborhood, the attention of the officers was drawn to a white Audi. A computer check of the license plate revealed the vehicle to be a rental car. Officers observed the Audi commit a traffic violation and, therefore, followed the car and activated their lights as the vehicle parked on a Walgreens parking lot at 2202 Chambers Road. This location is in the Eastern District of Missouri.

      b.  Officers made contact with defendant, who was the sole occupant of the vehicle. Officers retrieved a firearm from the driver's side of the floorboard of the car. Defendant admits to knowing possession of that firearm. Officers also retrieved from the vehicle 11 grams of cocaine base, .9 grams of heroin, a quantity of oxycodone, 168 grams of marijuana, a black digital scale, a box of plastic bags, three flip phones, and two iPhones.

      c.  The firearm was a Glock make, 43 model, 9mm caliber, semi-automatic pistol bearing serial number BFCK348. The firearm was manufactured in Austria and imported by way of Smyrna, Georgia. Therefore, the firearm necessarily traveled in interstate and foreign commerce in order to reach defendant's possession of the firearm on December 7, 2017.

      [d].  Prior to defendant's possession of the firearm on December 7, 2017, he had been convicted of at least one felony offense punishable by a term of imprisonment exceeding one year under the laws of the State of Missouri.

Plea Agreement (ECF No.40 at 2-3).

    Pursuant to the Plea Agreement, in exchange for Adams' guilty plea the Government agreed it would not pursue additional charges arising out of his conduct on December 7, 2017, relating to possession with intent to distribute a controlled substance and possession of a firearm in furtherance of a drug trafficking crime. (Id. at 1-2.)

    Adams pleaded guilty to the single-count indictment on July 10, 2018. Following Adams' guilty plea, the United States Probation Office prepared a Presentence Investigation Report ("PSR"). The PSR reflects that Adams was born into a chaotic and unstable situation. His parents both suffered from drug addiction and his father was in and out of prison. Adams reported being surrounded by illegal drug use and distribution as a child, as his mother, father, and uncles on his father's side all abused and sold illegal drugs. Adams indicated his father physically abused him

on a weekly basis between ages 7 and 10 by punching him, but this abuse was never reported. Adams reported he also observed domestic violence between his mother and father on a daily basis between ages 7 and 10.  His mother was murdered when he was 10 and his father was charged with the murder but the case was dismissed.  Following his mother's death Adams resided with his grandmother but "had to take care of himself."  (ECF No. 53 ¶ 47.)

Adams attended high school until the eleventh grade when he stopped attending at the age of 16.  (Id. ¶ 59.)  Despite his difficult start and lack of a stable family, Adams had only a single felony conviction at the time of his arrest in the instant case for Felon in Possession of a Firearm. In 2009, at the age of 19, he engaged in three sales of cocaine at $225 each to undercover officers within the space of one week.  Adams was charged in a three-count Indictment in St. Charles County, Missouri, with Sale of Cocaine and pled guilty to all three counts on January 22, 2010. Adams was sentenced to eight years' incarceration, received a Suspended Execution of Sentence and was placed on five years' probation.  Adams received three probation violations for failing to complete the Pathways to Change Program as directed, received a new misdemeanor charge of possessing marijuana, and failed to pay intervention fees as directed, but completed his probation successfully without any revocations on December 27, 2013.  (ECF No. 53 ¶ 37.)  Adams had never served a period of incarceration prior to this case and was granted pretrial release while the charges were pending.  His total criminal history score was one and his criminal history category was I.  (Id. ¶39.)

The PSR concluded, however, that Adams was an armed career criminal ("ACC") under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e):

> The offense of conviction is a violation of 18 U.S.C. § 922(g), and the defendant has at least three prior convictions for a violent felony or serious drug offense, or both, which were committed on different occasions.  (The Sale of Cocaine on April 27, 2009, April 28, 2009, and May 4, 2009, under docket No.: 0911-CR-2567-01).

5

Therefore, the defendant is an armed career criminal and subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e).

(ECF No. 53 ¶ 31.)  Because Adams was an ACC, his criminal history category was IV.  (Id. ¶ 40.)

The PSR states that Adams has no history of substance abuse (id. ¶ 58), but two violation reports filed by the Pretrial Services Office reflected opiate use which Adams contended was from prescribed painkillers.  (ECF Nos. 48, 50.)  Adams obtained a Missouri Class E Driver's License (chauffeur license) in 2011 and has prior employment in various factory positions and as a bus driver prior to 2013, but was unemployed for the five years prior to his conviction in this case and declined to state how he was supported during that time.  (ECF No. 53 ¶¶ 62-65.)  Adams has six children, two of whom he was ordered to pay support for, and is in arrears on child support payments.  (Id. ¶¶ 48-53.)

Defendant appeared before the Court for sentencing on December 19, 2018.  The Court sentenced Defendant as an Armed Career Criminal to a mandatory minimum term of imprisonment of 180 months, to be followed by a three-year term of supervised release. Defendant has served approximately 24 months of the 180-month sentence.

**Legal Standard**

Adams moves for release under 18 U.S.C. § 3582(c)(1)(A).  As amended by the First Step Act, Section 3582(c)(1)(A) authorizes the Court to modify terms of imprisonment as follows:

> [T]he court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons

6

warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

**Discussion**

To be entitled to relief under the statute, Adams must meet both the exhaustion requirement and demonstrate that "extraordinary and compelling reasons" warrant a reduction of his sentence. The Court addresses these requirements in turn.

A. <u>Administrative Exhaustion Requirement</u>

As discussed previously, the Court finds that Adams submitted a request for reduction in sentence/compassionate release to the Warden of Forrest City Low on April 29, 2020, and has administratively exhausted his claim.

B. <u>Extraordinary and Compelling Reasons for Release</u>

I.

Section 3582(c)(1)(A) authorizes courts to reduce a sentence for "extraordinary and compelling reasons," but only if "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." Congress has not defined "extraordinary and compelling reasons" except to state that "rehabilitation alone" does not suffice. 18 U.S.C. § 944(t) (cleaned up). The Sentencing Commission was authorized to define the term and it did so before enactment of the First Step Act, which amended section 3852(c)(1)(A) to, among other things, allow inmates to petition courts directly for compassionate release, and eliminate the BOP's previously exclusive "gatekeeper" role. <u>See</u> <u>United States v. Rodriguez</u>, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020).

Section 1B1.13 of the Sentencing Guidelines states that a sentence reduction under section 3582(c)(1)(A) may be ordered where a court determines, "after considering the factors set forth in 18 U.S.C. § 3553(a)," that

> (1)(A) Extraordinary and compelling reasons warrant the reduction;
> . . .
>
> (2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) The reduction is consistent with this policy statement.

In subsections (A)-(C) of the Application Note to section 1B1.13, the Commission identified three "reasons" that meet the "extraordinary and compelling" standard of section 3582(c)(1)(A):  (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his sentence; or (C) two family related circumstances.  See id. cmt. n.1(A)-(C).  The policy statement also has a catchall provision for "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in subdivisions (A) through (C)."  Id. cmt. n.1(D).

The only provision of the amended statute that would allow Adams to be released is if the Court finds "after considering the factors set forth in section 3553(a) to the extent they are applicable," that "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i).   The statute also provides that any reduction must be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A). These portions of § 3582 existed before the First Step Act and were not changed by that law.

The Government argues that Adams does not meet the statutory standards, cannot show that he meets any of the reasons listed in the policy statement issued by the sentencing

commission, and that the Court is restricted to the policy statement in Section 1B1.13 in making its decision.  The Court has rejected this latter argument on numerous occasions, concluding that Section 1B1.13 does not limit the factors a district court can consider.  See, e.g., United States v. Williams, 2020 WL 7392875, at *6 (E.D. Mo. Nov. 25, 2020); United States v. Easton, 1:18-CR-22 RLW (Mem and Order of Nov. 17, 2020) (ECF No. 71); United States v. Carroll, 4:98-CR-351 RLW (Mem. and Order of Sept. 14, 2020) (ECF No. 201).

Sentencing Guidelines section 1B1.13 and its Application Note 1 have not been amended to reflect the changes made by the First Step Act, because the United States Sentencing Commission has not had a quorum since the passage of the Act.  Guidelines Section 1B1.13 is inconsistent with the amended statute because it requires the BOP Director to make a motion for compassionate release.  Application Note 1 is inconsistent with the new law because its list of specific reasons that could justify compassionate release (medical condition, age, family circumstances) are not required by the statute and its catch-all "other reasons" subsection requires the BOP Director to determine what are "extraordinary and compelling" reasons.  Based on interpretation of the statute's language, several of the U.S. Circuit Courts of Appeals and a growing consensus of district courts have found the guideline is inapplicable to First Step Act motions filed by prisoners and does not limit the factors a district court may consider.  See United States v. McCoy, 981 F.3d 271, 281-82 (4th Cir. 2020) (citing cases).

The Eighth Circuit Court of Appeals has not yet articulated the extent of a district court's discretion under the First Step Act to determine whether extraordinary and compelling reasons exist for compassionate release, but it has recognized that such discretion exists.  See United States v. Rodd, 966 F.3d 740, 746-47 & n.7 (8th Cir. 2020).  The Second Circuit Court of Appeals examined the First Step Act in depth in United States v. Brooker (Zullo), 976 F.3d 228 (2d Cir. 2020).  The district court denied defendant Zullo's motion for compassionate release relying on

Guideline § 1B1.13, "which seemingly still required a motion by the BOP." Id. at 234.  The Second Circuit analyzed the First Step Act's language and held it allows courts independently to determine what reasons, for purposes of compassionate release, are "extraordinary and compelling," id. at 236, and that Guidelines § 1B1.13 Application Note 1(D) applies *only* where a First Step Act motion is filed by the BOP.  Id. at 230, 236.  The Second Circuit concluded "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.  Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." Id. at 237.

The Second Circuit also observed, "It bears remembering that compassionate release is a misnomer.  18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions.  A district court could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place." Id. at 237.  "Beyond this, a district court's discretion in this area—as in all sentencing matters—is broad.  The only statutory limit on what a court may consider to be extraordinary and compelling is that "[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t) (emphasis added)." Id. at 237-28 (internal citation and footnote omitted).

The Sixth Circuit Court of Appeals followed the Second Circuit and held that the First Step Act's passage rendered § 1B1.13 'inapplicable' to cases where an imprisoned person files a motion for compassionate release." United States v. Jones, 980 F.3d 1098, 1109 (6th Cir. 2020) (citing Brooker, 976 F.3d at 234).  The Sixth Circuit concluded, "Until the Sentencing Commission updates § 1B1.13 to reflect the First Step Act, district courts have full discretion in the interim to determine whether an 'extraordinary and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." Id.  In sum, "In cases where

incarcerated persons file motions for compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13." Id. at 1111.

The Seventh Circuit Court of Appeals also reached the same conclusion, holding that "Section 1B1.13 addresses motion and determinations of the [BOP] Director, not motions by prisoners." United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020) (citing Brooker, 976 F.3d 228). The Seventh Circuit found that "the Sentencing Commission has not yet issued a policy statement 'applicable' to [prisoners'] requests." Id. The court concluded, "Until . . . § 1B1.13 is amended, . . . the Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release. District judges must operate under the statutory criteria—'extraordinary and compelling reasons'—subject to deferential appellate review." Id.

Most recently, the Fourth Circuit Court of Appeals "agree[d] with the Second Circuit and the emerging consensus in the district courts: There is as of now no 'applicable' policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are 'empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise.'" McCoy, 981 F.3d at 284 (quoting Brooker, 976 F.3d at 230) (holding the severity of defendants' sentences as a result of "stacking" under former 18 U.S.C. § 924(c), coupled with the disparity between those sentences and the sentences they would receive today, constituted extraordinary and compelling reasons for relief under the First Step Act).

In the absence of contrary authority from the Eighth Circuit, the Court finds persuasive the Second Circuit's analysis, as followed by the Sixth, Seventh, and Fourth Circuits. Guidelines section 1B1.13 and its application note are not "applicable" to a prisoner-filed motion and do not limit the factors a district court can consider with respect to compassionate release.

11

II.

The Court now turns to the merits of Defendant's compassionate release motions.   In support of his motions, Adams states he is a 31-year-old Black male who suffers from migraines and has a history of asthma with current use of an inhaler.  Adams states that although his asthma diagnosis is not documented in his PSR, a review of his BOP medical records for 2019 and 2020 show he was diagnosed with asthma and has been prescribed an inhaler since at least February 2019, shortly after he entered BOP custody, and the records indicate onset of asthma between the ages of 9-18 years old.  Adams asserts that his race, gender and diagnosis of asthma all place him at greater risk of more serious illness from COVID-19, as according to the U.S. Centers for Disease Control and Prevention, Black males have a five times higher rate of hospitalization or death from COVID (ECF No. 81 at 1).[1]

Adams states that he lives in open dorm, cubicle-style housing and sleeps less than six feet from prisoners in an open space shared by some 100 other inmates who do not consistently use prison-issued facemasks.  He was remanded to custody on December 19, 2018, to begin serving his 180-month sentence and is currently scheduled for release on October 26, 2031.[2]  Adams states he has only incurred a single disciplinary violation for use of a cell phone, and that he immediately engaged in classes to obtain his GED in prison and successfully acquired it on January 27, 2020.

Adams describes a "chaotic and unstable" upbringing and the loss of both of his drug-addicted parents to death and prison when he was 10 years old, and being "essentially left to his

---

[1]Defendant's citation for this information was https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnicminorities.html.

[2]Federal Bureau of Prisons, Inmate locator, https://www.bop.gov/inmateloc/ (last visited Jan. 11, 2021).

own devices" at age 13 after his grandmother died.[3]  (ECF No. 81 at 2.)  Adams states that despite his difficult start and lack of a stable family, he had only a single felony conviction at the time of his federal arrest for Felon in Possession of a Firearm.  This conviction occurred in 2009 when he was 19 and engaged in the sale of cocaine on three separate occasions for $225 each sale.  He was charged in a three-count Indictment in St. Charles County with Sale of Cocaine and pled guilty to all three counts on January 22, 2010.  He received a Suspended Execution of Sentence with eight years suspended and five years of probation.  He completed his probation successfully without a single revocation on December 27, 2013, had never served a period of incarceration prior to this case, and was granted pretrial release while the charges were pending.

Adams asserts that the sentencing transcript shows he was unaware at the time he entered his plea that his single conviction would qualify him as an Armed Career Criminal and result in a mandatory minimum sentence of 15 years.  (ECF No. 71 at 4.)  Adams states that unlike what is expected of an individual deemed an "Armed Career Criminal," he had never engaged in a crime of violence, had never spent a day in prison prior to this case, and had only a single felony arrest and conviction when the Court imposed a mandatory minimum sentence of 15 years.  Adams states that his guidelines sentence without the application of the Armed Career Criminal enhancement would have been 37 to 46 months.

Adams contends that he establishes extraordinary and compelling reasons for sentence reduction because he faces not only an exceptionally long mandatory minimum sentence but is being required to serve that sentence during a pandemic in a prison with one of the highest rates of infection, while being at greater risk of complications and death as a result of his asthma condition and race.

---

[3]The statement in the supplemental motion filed by the FPD, that Adams' grandmother died when he was 13, conflicts with information in the PSR which states that Adams' grandmother died in 2012 (ECF No. 53 ¶ 47), when Adams would have been approximately 23 years old.

The United States opposes Adams' motions, first noting that the Presentence Investigation Report states Adams reported suffering no health problems other than leg pain resulting from a 2003 accident when his bicycle was hit by a car, and did not mention suffering from asthma at any time during the criminal proceedings.  (ECF No. 91 at 3.)  The United States asserts that Adams was not diagnosed with asthma until he entered the Bureau of Prisons, he then was prescribed an inhaler to use on an "as needed" basis, and there is nothing in the medical records to suggest his asthma is severe or that he is unable to attend to his asthma adequately with the use of his inhaler. The United States describes Adams as "advanc[ing] the possibility that he will become infected with COVID-19 as grounds for erasing the remainder of his sentence.  Although Defendant has established that he has asthma, this speculative concern about contracting COVID-19 cannot justify compassionate release."  (Id. at 8-9.)[4]

The United States also contends that Adams fails to show his continued incarceration at FCI Forrest City Low warrants a reduction in sentencing, pointing to the BOP's implementation of the COVID-19 Action Plan which requires all facilities to mitigate the spread of COVID-19 with multiple proactive measures, and noting that while Forrest City Low had over 600 active cases "over the past many months," as of September 22, 2020, there were only two active COVID cases among inmates and ten among staff with no deaths, indicating that Forrest City Low has established it is capable of treating such a disease.  (Id. at 10-11.)

The United States argues in the alternative that Adams' request for sentence reduction should be denied because he fails to demonstrate that he merits release under the § 3553(a) factors,

---

[4]Though the United States recognizes the CDC has indicated individuals with moderate to severe asthma might be at risk of severe illness from COVID-19, it argues that under section 1B1.13, cmt. n.1, a defendant must establish he is suffering from either a "terminal" illness or a "serious physical or mental condition . . . that substantially diminishes the ability . . . to provide self-care . . . and from which he or she is not expected to recover," and Adams' asthma does not qualify under this standard.  Because Section 1B1.13 does not apply to motions filed by prisoners, the Court does not address this argument.

and that is not a danger to the safety of any other person or to the community.  The United States argues that although Adams "was convicted of being a felon in possession of a firearm, the facts underlying his conviction establish he was a drug dealer.  He was found with multiple types and quantities of controlled substances, a firearm to protect his drug trade, over $1,000 in drug proceeds and numerous cell phones" and he has three prior convictions for distributing drugs.  (Id. at 13.)  The United States argues this shows Adams is a danger to the community.  It also contends that as a result of Adams' prior convictions for serious drug offenses, he was sentenced to a mandatory minimum sentence of 180 months under the Armed Career Criminal Act, and the grant of early release after serving only 20 (now 24) months would not reflect the seriousness of his offense, promote respect for the law, or provide just punishment.  (Id.)

III.

Under current CDC guidance, Adams may be at increased risk for severe illness from COVID-19 because he has asthma.[5]  "Severe illness from COVID-19 is defined as hospitalization, admission to the ICU, intubation or mechanical ventilation, or death."[6]  Further, CDC data indicate that the effects of COVID-19 are more severe and disproportionate on Blacks.  An analysis based on CDC data through June 6, 2020, shows that in every age category, Black people are dying from COVID at roughly the same rate as white people more than a decade older, and the disparities are especially marked in somewhat younger age groups.[7]  For example, for those aged

---

[5]U.S. Centers for Disease Control and Prevention, COVID-19, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Jan. 11, 2021).

[6]See n.5, supra.

[7]Tiffany N. Ford, Sarah Reber, and Richard V. Reeves, "Race gaps in COVID-19 deaths are even bigger than they appear," The Brookings Institution (June 16, 2020), https://www.brookings.edu/blog/up-front/2020/06/16/race-gaps-in-covid-19-deaths-are-even-bigger-than-they-appear/ (last visited Jan. 11, 2021).

35-44, Black death rates are approximately nine times higher than for whites, and overall the age-adjusted COVID-19 death rate for Black people is 3.6 times that for whites.[8]

Adams' imprisonment during the COVID-19 pandemic places him at greater risk of catching and becoming seriously ill from COVID-19 because he is unable to observe social distancing protocols.  Despite the BOP's significant efforts at mitigation and containment, it appears Adams is objectively at significant risk of contracting the disease and cannot engage in adequate social distancing behavior in the institutional environment.  According to public health experts, social distancing measures are the most effective way to combat the rapid spread of COVID-19 and prevent illness.  "Limiting close face-to-face contact with others is the best way to reduce the spread of coronavirus disease 2019 . . . .  Social distancing is especially important for people who are at higher risk for severe illness from COVID-19."[9]  Unfortunately, in the context of institutional confinement, social distancing can be nearly impossible to implement and follow, given the large numbers of inmates held together in crowded, closed facilities.  In light of this reality, courts around the country have recognized that the risk of COVID-19 to people held in jails and prisons "is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected."  See Basank v. Decker, 449 F.Supp.3d 205, 211 (S.D.N.Y. 2020); see also United States v. Harris, 451 F.Supp.3d 64, 67 (D.D.C. 2020).  As of January 11, 2021, 188 BOP inmates and 3 staff have died from COVID-19 and over 41,000 inmates have been diagnosed with the disease.[10]  "Already 'tinderboxes for

---

[8]See n.7, *supra*.

[9]U.S. Centers for Disease Control and Prevention, COVID-19, Social Distancing, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited Jan. 11, 2021).

[10]Federal Bureau of Prisons, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (last visited Jan. 11, 2021).

infectious disease,' prisons now are even more dangerous than we typically accept." United States v. Brown, 457 F. Supp. 3d 691, 695 (S.D. Iowa 2020) (quoted case omitted).

"[C]ourts have noted that an ongoing and current outbreak at an inmate's prison facility can help contribute to 'extraordinary and compelling' reasons warranting that inmate's release." United States v. Rivera, 2020 WL 7188418, at *3 (D. Conn. Dec. 7, 2020) (citing, e.g., United States v. Park, 456 F.Supp.3d 557, 561 (S.D.N.Y. 2020) ("The Court's concern with Ms. Park's health during this time is greatly exacerbated by her place of incarceration."); United States v. Quintanilla, 2020 WL 5593203, at *3 (N.D. Ind. Sept. 17, 2020) (stating a prisoner's "showing that his particular institution is facing a serious outbreak of COVID-19 infections" is one factor that helps establish "extraordinary and compelling reasons" warranting a reduction in sentence)).

FCI Forrest City Low is currently experiencing a significant COVID-19 outbreak, and it is certainly possible the outbreak will continue to worsen. Active cases at the institution have increased dramatically since the original briefing on Adams' motions in this case. As of the date of this Order, there are 73 active inmate cases and 25 active staff cases, with 684 recovered inmates, 4 recovered staff, and no deaths.[11] This is in comparison to a total of twelve active inmate and staff cases on September 22, 2020, as set forth in the United States' opposition. Further, while the United States points in part to the BOP "prohibiting all social and volunteer visits" as one of its anti-COVID safeguards (ECF No. 91 at 10), the BOP and FCI Forrest City Low subsequently reinstated social visits as of October 3, 2020,[12] which added more people who have been out in society into the institution, on top of BOP staff, and the positive case load

---

[11]Federal Bureau of Prisons, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (last visited Jan. 11, 2021).

[12]Federal Bureau of Prisons, Bureau to Resume Social Visitation, https://www.bop.gov/resources/news/20200902_visitation.jsp (last visited Nov. 24, 2020) (no longer available); see also BOP FCI Forrest City Low, Visiting Information, Special Visiting Schedule & Procedures, Modified visiting information related to COVID-19 (starts October 3, 2020) https://www.bop.gov/locations/institutions/for/ (last visited Jan. 11, 2021).

quickly increased.[13]  The Court finds Adams has a particularized risk of contracting COVID-19 at FCI Forrest City Low, and a significant risk of severe illness therefrom if he does so, based on his asthma and his race, and the conditions of confinement at FCI Forrest City Low that preclude him from observing social distancing and other preventative measures such as uniform mask use, frequent handwashing, and availability of hand sanitizer.

Courts routinely focus on a defendant's rehabilitation as one non-dispositive factor contributing to "extraordinary and compelling reasons."  Rivera, 2020 WL 7188418, at *4 (citing United States v. Rodriguez, 2020 WL 5810161, at *4 (S.D.N.Y. Sept. 30, 2020) ("[W]hile rehabilitation alone is insufficient, it can interact with the present coronavirus pandemic to create an extraordinary and compelling reason for a sentence reduction.") (quoting Brooker, 976 F.3d at 238) (cleaned up)).  While in BOP custody, Adams has made efforts to better himself by quickly obtaining his GED, and has incurred only one citation for non-compliance with prison rules.  The Court places significant weight on Adams' post-sentencing conduct and positive prison record, which "provides the most up-to-date picture of [his] 'history and characteristics.'"  Pepper v. United States, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)).

Courts also consider overly harsh sentences and sentencing disparities as factors contributing to "extraordinary and compelling reasons."  See, e.g., Brown, 457 F.Supp.3d at 701-02 (holding defendant's health conditions during COVID-19 pandemic, rehabilitation, and changes to 18 U.S.C. § 924(c) stacking constitute extraordinary and compelling circumstances; citing cases); Williams, 2020 WL 7392875, at *6 (Black male defendant's status as former smoker and conditions of confinement during COVID-19 pandemic, rehabilitation, and sentence greater

---

[13]At a later date, visiting at FCI Forrest City Low was again suspended until further notice.  See https://www.bop.gov/locations/institutions/for/ (last visited Jan. 11, 2021).

than necessary to comply with sentencing factors of § 3553(a) constitute extraordinary and compelling circumstances).  Here, it is apparent that neither Adams nor the United States expected he would be designated an Armed Career Criminal, given his criminal history score of one and criminal history category of I, based on a single felony conviction from 2009 when he was 19.  Adams had never been imprisoned prior to this case and no history of violence.  Under these circumstances, the ACC designation overstates his criminal history and the gravity of his single prior felony controlled substance offense.

For these several reasons, the Court finds that Adams establishes extraordinary and compelling reasons for a reduction of his sentence.

C. <u>Section 3553(a) Factors</u>

Section 1B1.13 of the Sentencing Guidelines further provides that a court may reduce a term of imprisonment only if it determines that "[t]he defendant is not a danger to the safety of any other person or to the community[,]" U.S.S.G. § 1B1.13(3), and only after it considers the factors set forth in 18 U.S.C. § 3553(a).

The Court finds that the factors listed in 18 U.S.C. § 3553(a) weigh in favor of reducing Adams' sentence.  Because section 3553(a) establishes factors to consider in initially imposing a sentence, not every factor applies here.  The applicable factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; . . . [and]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

18 U.S.C. § 3553(a).

With respect to the nature and circumstances of the offense, although Adams' conviction is related to possession of a firearm, it was not a crime of violence and his offense conduct was nonviolent. Adams also possessed cocaine base, heroin, oxycodone tablets, and marijuana, however, though in relatively small quantities; a digital scale, a box of plastic bags, five phones including three flip phones, and $1,101 in suspected drug sale proceeds. The "nature and circumstances of the offense" are serious. That said, Adams promptly agreed to plead guilty and in return the United States agreed not to pursue charges relating to possession with intent to distribute a controlled substance and possession of a firearm in furtherance of a drug trafficking crime, presumably for valid reasons.

As for the history and characteristics of the defendant, Adams' personal history reveals an unstable and troubling childhood, with two drug-addicted parents who engaged in domestic violence on a daily basis, a father who subjected Adams to weekly physical abuse, and parents and uncles who demonstrated for him the example of using and dealing drugs. Adams' mother was murdered when he was ten, possibly by his father, and his father was in and out of prison, leaving Adams to be largely self-sufficient thereafter although he resided with a grandmother. Nonetheless, at the time of his arrest in this case at age 28, Adams had only one conviction dating from when he was 19, based on three sales of crack cocaine to undercover officers in the amount of $225 each that occurred in the span of one week. Considering the circumstances of his upbringing, this is surprising. As previously noted, Adams had never served time in prison prior

20

to this case, having successfully completed an SES and five years' probation on that felony conviction, and has no history of violence.  Adams' criminal history score was one and his criminal history category was I, absent the Armed Career Criminal enhancement.

Despite never having been incarcerated before and entering the BOP facing a lengthy sentence, Adams was able to adjust well and immediately sought to improve his condition by obtaining his GED, allowing him the ability to engage in other courses and programs.  His institutional conduct record has been good, with only one non-violent disciplinary infraction.  The BOP's own Risk Pattern Assessment rates his risk of recidivating at "low" and deems him Federal Time Credit Eligible.  As previously stated, the Court gives significant weight to Adams' post-sentencing conduct and positive prison record as indicating his current characteristics.  See Pepper, 562 U.S. at 492 (citing 18 U.S.C. § 3553(a)(1)).

The Court considers the need for the sentence imposed to serve the enumerated purposes of punishment.  Id. § 3553(a)(2).  The court should "impose a sentence sufficient, but not greater than necessary, to comply with [these] purposes."  Id. § 3553(a).  Adams was sentenced to a mandatory minimum sentence of 180 months and has served approximately 25 months.  Had he not been designated an Armed Career Criminal, the sentencing range would have been 37 to 46 months.  For the reasons previously discussed, Adams' ACC enhancement significantly overstated his limited criminal history and the gravity of his offense conduct.  The resulting 180-month sentence was greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from Adams' crimes.  Further, at the time of sentencing, the Court could not foresee the COVID-19 pandemic which has greatly increased the mental and physical toll on incarcerated persons as a result of BOP actions taken to reduce spread of the disease, was not

aware of Adams' asthma, and had no way to anticipate that Adams' status as a Black male with asthma would seriously jeopardize his health while incarcerated.

Applying the § 3553(a) factors in this case, the Court finds a reduction of Adams' sentence to 37 months is appropriate under 18 U.S.C. § 3582(c)(1)(A).  A 37-month sentence is long enough to reflect the seriousness of his offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from his crimes.  Section 3582(c)(1)(A) permits such a reduction.  See Brooker, 976 F.3d at 237 ("A district court could . . . reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place.").  To prolong Adams' incarceration further would be to impose a sentence "greater than necessary" to comply with the statutory purposes of punishment, particularly where to do so presents a serious danger to his health and possibly his life.  The Court also does not anticipate that a 37-month sentence would cause sentencing disparities with defendants with similar records who have been found guilty of similar conduct.

The Court considers whether Adams presents "a danger to the safety of any other person or to the community[.]"  U.S.S.G. § 1B1.13(2).  Factors relevant to this inquiry include: (1) the nature and circumstances of the offenses of conviction; (2) the weight of the evidence; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger posed by the defendant's release.  See 18 U.S.C. § 3142(g).

The first three factors have been discussed above, so the Court focuses on the nature and seriousness of the danger posed by Adams' release.  The Court cannot say that Adams poses no risk at all to public safety, based on the circumstances of this offense which include his possession of a firearm, controlled substances, and other items indicating drug distribution, and his lack of a history of regular employment.

The Court finds the risk of Adams engaging in further criminal conduct is low, however, as reflected by his BOP pattern score, and can be managed further through BOP programs and classes that will assist him in preparing for release, and by the terms of his supervised release. <u>See</u> 18 U.S.C. § 3142(g) (stating that conditions of release can mitigate danger to the community). Adams can continue taking programs and preparing himself for a return to society during the remainder of his sentence.[14]  After serving 37 months, Adams will be placed on supervised release for three years, and the standard and special conditions previously imposed will result in substantial oversight by the United States Probation Office.  <u>See</u> Judgment (ECF No. 64).  With appropriate supervision, the Court concludes Adams will not be "a danger to the safety of any other person or the community, as provided in 18 U.S.C. § 3142(g)."  <u>See</u> U.S.S.G. § 1B1.13(2). The conditions of supervision will serve as continued sanctions and additional deterrents.

Adams has an acceptable release plan as he has a place to live with his sister in a three-bedroom house she rents in north St. Louis County, Missouri (ECF No. 83 at 3), and upon release the United States Probation Office in this District will supervise him and provide structure and support through its numerous programs designed to facilitate reentry into society.  Adams has now experienced incarceration and will know that if he violates release conditions and the Court revokes his supervised release, he will return to prison and also place his health in jeopardy.  The Court finds that these additional sanctions will protect the public from the risk of future crimes by Adams.

On balance, the Court concludes that the applicable § 3553(a) factors support Adams' request for a reduction in sentence.

---

[14]The Court is aware that most if not all BOP educational programming is currently suspended because of the COVID-19 pandemic.

**Conclusion**

For the foregoing reasons, Adams' Motion for Reconsideration and motions for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) will be granted as follows. Adams' sentence is reduced to 37 months pursuant to 18 U.S.C. § 3582(c)(1)(A). Upon release, Adams will be subject to the conditions of supervision for a period of three years on terms previously imposed, as set forth in the amended judgment to be entered by the Court. All other aspects of Adams' sentence remain unchanged.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Leo Adams' pro se Motion for Reconsideration is **GRANTED**. (ECF No. 94.)

**IT IS FURTHER ORDERED** that Defendant Leo Adams' pro se Motion for Reduction in Sentence Under 18 U.S.C. § 3582 (ECF No. 73) and Supplemental Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (ECF No. 81) are **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Leo Adams' sentence is reduced to 37 months with three (3) years supervised release on terms previously imposed. An Amended Judgment will be issued separately.

**IT IS FINALLY ORDERED** that the Clerk shall provide a copy of this Order to the Probation Office and to the Bureau of Prisons.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

Dated this 11th day of January, 2021.

24